UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PAUL KARDASZ, et al

        Plaintiffs,

                                Case No. 17-cv-10937

v.

                                HON. MARK A. GOLDSMITH

KAREN SPRANGER, et al

        Defendants,

_____/

## OPINION & ORDER
## (1) DENYING DEFENDANT MACOMB COUNTY'S MOTION FOR SUMMARY JUDGMENT (Dkt. 44) AND (2) DENYING DEFENDANT KAREN SPRANGER'S MOTION FOR SUMMARY JUDGMENT (Dkt. 47)

       This matter is before the Court on Defendant Macomb County's ("Macomb") and Defendant Karen Spranger's respective motions for summary judgment (Dkts. 44, 47). The issues have been fully briefed.[1] Because oral argument will not aid the decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). For the reasons that follow, Defendants' respective motions are denied.

### I. BACKGROUND

       Plaintiff Paul Kardasz was the Chief Deputy Clerk of Macomb County from January 3, 2017 to March 10, 2017; Plaintiff Erin Stahl was the Chief Deputy Register of Deeds of Macomb County from January 3, 2017 to March 10, 2017. They were both appointed, and then fired, by Defendant Karen Spranger, who at the time was Clerk of Defendant Macomb County. The Chief

_____

[1] Defendant Spranger did not file a reply, and the time to do so has expired. See E.D. Mich. L.R. 7.1(e)(1)(C).

Deputy Clerk is the highest appointed position in the Clerk's office, and is responsible for supervising the five departments of the Clerk's office; hiring, firing, and disciplining within the Clerk's office; and serving as the county's election official and liaison to several county leaders. See Def. Macomb Statement of Facts ("Macomb SOF"), ¶¶ 5-6 (Dkt. 44). The Chief Deputy Register of Deeds is responsible for supervising the Register of Deeds' office; hiring, firing, and disciplining within the Register of Deeds' office; developing and administering policy; and controlling expenditures for the Register of Deeds. Id. ¶ 7.

The two months that Kardasz and Stahl worked under Spranger were contentious. Kardasz and Stahl opposed some of Spranger's internal decisions, including: replacing supervisory positions with appointees, appointing Jackie Ryan and Joseph Hunt as unpaid deputies, the decision not to fill vacant union positions, Ryan and Hunt attending meetings, and Spranger's use of Kardasz's computer after Spranger's IT privileges were revoked. Macomb SOF ¶ 9. By late January 2017, Stahl felt that she and Kardasz were soon to be replaced. See 1/25/2017 Facebook message, Ex. G to Macomb Mot., at PageID.837 ("I know that today [Spranger] was running around . . . and will be replacing [Kardasz] and myself with others.") (Dkt. 44-8).

According to Kardasz's uncontested testimony, on March 10, 2017, Kardasz confronted Spranger with a written ethics complaint and discussed with Spranger the concerns he had outlined. See Kardasz Dep., Ex. 5 to Pl. Resp. to Macomb Mot., at 142-144 (Dkt. 56-6). Kardasz submitted the complaint to the Macomb County Ethics Board that day, as Spranger stood by. Id. at 339. Spranger then told Kardasz that she would have to replace him over this. Id. at 151. Kardasz acknowledged that such a threat was not out of the ordinary. Id. Nonetheless, Spranger terminated Kardasz the following day – March 11 – with a termination letter dated March 10, handing him his termination letter and saying that "she was upset about yesterday." Id. at 351.

Stahl testified that she was contemplating drafting an ethics complaint at the same time. See Stahl Dep., Ex. C to Macomb Mot., at 397 (Dkt. 44-4). According to her testimony, she told Spranger on February 20 that she and Kardasz were "going to have to make a complaint if she doesn't change anything." Id. The next day, Spranger called Stahl into her office and told her that she would fire her for being insubordinate if she did not make an attitude adjustment. Id. As with Kardasz, Spranger drafted a termination letter on March 10, see Stahl Termination Letter, Ex. 23 to Pl. Resp. to Macomb Mot. (Dkt. 56-24), though Stahl did not receive the termination letter until March 13, see Stahl Dep. at 329. Stahl submitted her ethics complaint to the Ethics Board during the weekend of March 11-12, and alerted Spranger to that fact on March 12. See id. at 326-327.

Kardasz and Spranger brought this suit against Defendants, alleging a violation of 42 U.S.C. § 1983 for First Amendment retaliation and a violation of the Michigan Whistleblowers' Protection Act, Mich. Comp. Laws 15.361, et seq. Following the close of discovery, each Defendant brought a motion for summary judgment.

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3

# III. ANALYSIS

## A. First Amendment Claim

"To prove a claim under 42 U.S.C. § 1983, a plaintiff must establish: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected to or caused to be subjected to this deprivation by a person acting under color of state law." Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir. 1994) (footnote omitted). Plaintiffs claim that the retaliation engaged in by Defendants violated the First Amendment. Such a claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).

### 1. Macomb's Motion

Macomb makes three arguments, the first two of which relate to the first element of retaliation – whether the conduct was protected. Macomb argues: (i) Plaintiffs cannot maintain a First Amendment claim because they held confidential/policy-making positions, (ii) Plaintiffs' ethics complaints are not speech protected by the First Amendment, and (iii) there is no basis for municipal liability against Macomb County.

### a. Confidential/Policy-Making Position

Macomb first argues that Plaintiffs cannot survive summary judgment because their dismissals were nothing more than patronage dismissals. Plaintiffs contend that the caselaw surrounding patronage dismissals is completely irrelevant to the claims at issue, as they were terminated in retaliation for their ethics complaints, not because of their political affiliation.

Patronage dismissals, or dismissals due to failure to (i) support an elected official or (ii) abide by legislatively-enacted requirements based on religion or affiliation, are generally unconstitutional, as they violate a public employee's First Amendment right to political belief and expression. See Elrod v. Burns, 427 U.S. 347, 356-358 (1976). However, patronage dismissals are allowed where the circumstances call for a certain political affiliation as a legitimate requirement for employment. Id. at 366-368. The Sixth Circuit has explained that four categories of positions are subject to this exception:

**Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

**Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

**Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;

**Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

McCloud v. Testa, 97 F.3d 1536, 1557 (6th Cir. 1996). Macomb contends that the Deputy Clerk and Deputy Register of Deeds positions are Category Two and Three positions.

Macomb's argument is unavailing. The premise of Macomb's argument is that Plaintiffs were fired because of their political affiliations, but such a claim is not borne out in any way by the record. Rather, Plaintiffs' claim is that they were fired for making ethics complaints. Thus, Plaintiffs' political affiliations have no bearing on this case.

Macomb observes in its reply that the Elrod exception also applies to discharge based on speech if the plaintiff occupies a policymaking or confidential position and their speech addressed matters related to public policy. See Tompos v. City of Taylor, 644 F. App'x 678, 681 (6th Cir. 2016). This argument was raised for the first time in the reply brief, which is sufficient reason to deny Macomb relief based on the argument. See Ross v. Choice Hotels Intern., Inc., 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012) ("Choice Hotels is confined to those grounds raised in its motion and initial memorandum in support in its attempt to obtain summary judgment. This Court has explained time and again that a reply brief is not the proper place to raise an issue for the first time.") (internal quotation marks omitted).

Regardless, the case relied on by Macomb is readily distinguishable. In Tompos, the City of Taylor's fire chief spoke out to the media and the City Council regarding funding for the fire department. The Sixth Circuit concluded that these statements constituted an "overt act of disloyalty" towards the mayor which would cause "significant disruption in the working relationship between a confidential employee and his superiors." 644 F. App'x at 683. The Sixth Circuit found that "where a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views, the Pickering balance favors the government as a matter of law." Id. at 681 (citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).[2]

Here, unlike in Tompos, Plaintiffs made ethical complaints regarding Spranger's behavior that Plaintiffs believed constituted a violation of law; such complaints cannot be brushed off as mere political or policy disagreements. The plaintiff in Tompos made public statements related to

---

[2] The Pickering test requires courts to balance the interest of the government employee "in commenting upon matters of public concern" and the interests of the State, as employer, "in commenting upon matters of public concern." Pickering, 391 U.S. at 568.

disagreements he had with the mayor over funding of the fire department; unlike Plaintiffs here, he made no allegation that the mayor was breaking any kind of law. Further, there is no indication in this case that Plaintiffs went public with their complaints. Rather, Plaintiffs submitted their ethics complaints to Macomb County's Ethics Board. These were not disloyal acts in the manner contemplated by the Sixth Circuit in <u>Tompos</u>, in which a subordinate official publicly disagreed with his boss about a matter of public policy. Rather, Plaintiffs here utilized the process laid out by the county to alert the county of potential violations of law by a high-ranking county official. Unlike the cases in which the <u>Pickering</u> balance favors the efficiency interests of the government as an employer, the governmental interests here, where government employees were informing government institutions of potential wrongdoing by a high-ranking government official, weigh in favor of speech.[3]

Accordingly, the Court does not agree with Macomb that these were patronage dismissals not subject to First Amendment retaliation claims.

### b. First Amendment Protection

A public employee claiming free-speech retaliation in the employment context must meet three elements to establish a prima facie case: (1) the employee must have engaged in constitutionally-protected activity, (2) the employer's conduct must discourage individuals of "ordinary firmness" from participating in similar conduct, and (3) the employee's exercise in the constitutionally-protected activity must have been "a motivating factor" behind the employer's conduct. <u>See</u> <u>Evans-Marshall v. Bd. of Educ. Of Tipp City Exempted Vill. Sch. Dist.</u>, 624 F.3d

---

[3] Macomb also refers to <u>Rose v. Stephens</u>, 291 F.3d 917 (6th Cir. 2002), but that case is similarly distinguishable. There, the fired plaintiff authored a memorandum disagreeing with his boss on a personnel decision. The plaintiff was then fired after refusing to withdraw the memorandum. Unlike in this case, the plaintiff presented no allegations of wrongdoing and the memorandum directly related to the duties of his job.

332, 337 (6th Cir. 2010). If Plaintiffs prove their prima facie case, the burden shifts to Defendant to demonstrate that the same action would have been taken regardless of Plaintiffs' protected activity.[4] See Ratliff v. Wellington Exempted Vill. Sch. Bd. of Educ., 820 F.2d 792, 795 (6th Cir. 1987).

Macomb raises three arguments, all of which relate to why the speech is not constitutionally-protected. Macomb argues: (i) the speech does not implicate a matter of public concern; (ii) the speech was made as an employee, rather than as a citizen; and (iii) the governmental interests outweigh Plaintiffs' interests.

### i. Constitutionally-Protected Activity

First, Macomb argues that the speech does not implicate a matter of public concern. Speech by government employees is only protected where that speech is "fairly considered as relating to any matter of political, social, or other concern to the community[.]" Connick v. Myers, 461 U.S. 138, 146 (1983). Other terminations of non-tenured or statutorily-protected employees, even those that "may not be fair . . . are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." Id.

Macomb argues that the speech here does not relate to matters of public concern because it merely relates to Plaintiffs' own employment situations and internal personal disputes, see Rodgers v. Banks, 344 F.3d 587, 596 (6th Cir. 2003) ("[I]nternal personnel disputes or complaints about an employer's performance do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech.") (internal quotation marks omitted). Macomb claims that because the ethics complaints do not allege a conflict of interest, nepotism, or any similar wrongdoings, they do not touch about matters of public concern. Plaintiffs respond

---

[4] Macomb makes no such argument, and thus the Court will not address whether Macomb has rebutted Plaintiffs' prima facie case.

that their verbal complaints and ethics complaints referenced a number of issues of concern to the community. Plaintiffs have the better of this argument.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-148 (1983). Bringing to light actual or potential wrongdoing or breach of the public trust constitutes matters of public concern. See id. at 148 (finding that the plaintiff did not raise matters of public concern because "Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases[, n]or did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others."). Here, Kardasz's ethics complaint alleges that Spranger "administer[ed] Oaths of Office to Ms. Jackie Ryan and Mr. Hunt so as to circumvent federal, state and local hiring requirements" as neither Ryan nor Hunt were "administered an Oath of office to fill a statutorily mandated deputy position as prescribed by law." Kardasz Ethics Compl., Ex. H to Macomb Mot., at PageID.858 (Dkt. 44-9). Kardasz also accused Spranger of purposely not filling collectively-bargained positions for nefarious purposes, and allowing non-employees Ryan and Hunt to access the County IT network. Id. Stahl's ethics complaint similarly claims that Spranger has failed to comply with all laws and policies of county government. See Stahl Ethics Compl., Ex. 20 to Pl. Resp. to Macomb Mot., at PageID.2954 (Dkt. 56-21). Both ethics complaints alleged potential wrongdoing in violation of local law, and thus clearly pertained to matters of public concern.

Second, Macomb argues that Plaintiffs' ethics complaints are not speech as a citizen, but rather were made pursuant to their official duties. See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees

are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Plaintiffs respond that their complaints are protected speech because they center on issues that they learned about by virtue of their public positions but for which they were not responsible.

In Garcetti, the plaintiff was fired from his job as a deputy district attorney. The plaintiff had determined that an affidavit supporting a warrant contained "serious misrepresentations" and recommended to his bosses dismissal of the case; his bosses continued to pursue charges. The plaintiff claimed that he suffered retaliation in violation of the First Amendment as a result of his actions in the underlying case. The Supreme Court ruled that his statements were not entitled to First Amendment protection because "the memo was written pursuant to [plaintiff's] official duties" and that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. The Court explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Id. at 421-422.

The Court clarified its Garcetti holding in Lane v. Franks, 573 U.S. 228 (2014). In that case, the plaintiff was hired as the Director of Community Intensive Training for Youth in Alabama, a statewide program for underprivileged youth. While conducting an audit to determine why the program faced financial difficulties, the plaintiff discovered that an Alabama State Representative was on the program's payroll but had not been reporting to her office. When the state representative refused to adequately perform her job, the plaintiff fired her. A federal corruption investigation was initiated as a result of the firing, and the plaintiff was called to testify

before a federal grand jury regarding his reasons for the firing. The plaintiff later testified at trial, under subpoena. The plaintiff was then terminated, and the Eleventh Circuit, relying on <u>Garcetti</u>, found that he could not raise a First Amendment retaliation claim because the speech owed its existence to his professional responsibilities. The Supreme Court reversed, framing the essential question in <u>Garcetti</u> as "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." <u>Lane</u>, 573 U.S. at 240. The speech in <u>Lane</u> was different, because "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." <u>Id.</u> Essentially, testifying under subpoena was not in the job duties of the plaintiff in <u>Lane</u>, whereas writing the memorandum that supposedly led to retaliation in <u>Garcetti</u> definitively was part of the plaintiff's job responsibilities.

Based on this precedent, Plaintiffs are correct that this was speech as a citizen; the conduct in this case more closely resembles the speech in <u>Lane</u>, rather than the speech in <u>Garcetti</u>. Macomb contends that the allegations arose out of the day-to-day operation of the Clerk's Office and Register of Deeds, such that the ethics complaints "owe their entire existence to Plaintiffs' professional responsibilities in the management of the Clerk's office and ROD." Macomb Mot. at 19. But this is the argument rejected by the Supreme Court in <u>Lane</u>. The allegations in the ethics complaint surely <u>concerned</u> Plaintiffs' job duties, but the filing of the ethics complaints themselves was not <u>within the scope</u> of those duties. Accordingly, similar to the testimony provided by the plaintiff in <u>Lane</u>, Plaintiffs here were speaking as citizens, rather than government employees, when they made the ethics complaints.

Finally, Macomb argues that the governmental interests outweigh Plaintiffs' interest. "If the employee establishes that her speech touches matters of public concern, a balancing test

determines whether the employee or the employer wins." Evans-Marshall, 624 F.3d at 338. That test requires that courts balance the interests of the employee in "commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. Macomb argues that the content of the ethics complaint demonstrates that there was an absence of philosophical support for the Clerk, and an absence of trust and loyalty. Thus, Macomb concludes that there was a governmental interest in terminating their employment. Plaintiffs respond that, if such an argument were successful, no public employee would ever be entitled to First Amendment protection if they raise ethics questions about a superior.

The holding in Lane is once again instructive here. In that case, the Supreme Court noted that "[i]t would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim." Lane, 573 U.S. at 240-241. This rule was borne out of the idea that "[public] employees gain knowledge of matters of public concern through their employment." Id. at 240. Similarly, public employees are in a unique position to observe ethical violations by public officials, and the public is better served if those ethical violations are brought to light. It would be harmful to the public interest if public employees were forced to choose between bringing actual or potential ethical violations into public view and keeping their jobs. See id. at 241 ("Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs."). Accordingly, the Court finds that the Plaintiffs' interest is greater than the governmental interest in this case.

### ii. Other Elements

Macomb does not contest that the action would discourage individuals of ordinary firmness from participating in the conduct or that the ethics complaints were a motivating factor in the respective termination, but, as explained below, Plaintiffs carry their burden of proving both elements.

Accordingly, Plaintiffs have successfully established a prima facie case of First Amendment retaliation.

### 3. Municipal Liability

Macomb next argues that there is no basis for municipal liability because a municipality may not be held liable for a single act of a non-policy making official. According to Macomb, the county charter does not empower the county clerk to make employment policy for the county, and thus the county cannot be held liable for Spranger's actions. Plaintiffs respond that Spranger's actions are properly attributed to the county because her decision was not subject to review. Macomb argues in reply that the county can only be held liable where the county grants authority to make county policy to a person who later takes unconstitutional action. Plaintiffs have the better of this argument.

There is no dispute that Spranger did not make employment policy for the entire county, but that is also not the question at issue. Rather, the question is whether Macomb may be held liable for Spranger's actions because her actions were not subject to review.

The Supreme Court has made clear that "not every decision by municipal officers automatically subjects the municipality to § 1983 liability." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). Rather, the official taking such action must "be responsible for establishing final government policy respecting such activity before the municipality can be held liable." Id.

at 483. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." Id. Here, Macomb argues that Michigan state law grants the county clerk the authority to appoint and revoke the appointments of the Deputy Clerk and the Deputy Register of Deeds, and thus Macomb County never had the authority to delegate that authority to the County Clerk. See Macomb Reply at 9-10. Macomb fails to connect the dots of its argument. It concedes, as it must, that "[a]uthority to make municipal policy may be granted directly by a legislative enactment" and that the County Clerk has been provided that authority only by Michigan state law. However, it provides no support for its contention that the authority to make municipal policy must be legislatively enacted by the municipality itself to attach municipal liability under § 1983.

Rather, as the Supreme Court held in Pembaur, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483. This includes decisions made by officials whose decisions are not subject to review. See Miller v. Calhoun Cnty., 408 F.3d 803, 814 (6th Cir. 2005) (finding that the plaintiff's municipal liability claim may not proceed because she did not argue, inter alia, that the supposed policymaker's "decisions were not subject to review"); cf. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (finding that a subordinate's decision does not constitute municipal policy where that decision "is subject to review by the municipality's authorized policymakers" because the authorized policymakers have "retained the authority to measure the official's conduct for conformance with their policies") (emphasis in original).

Such is the case here. Spranger was the county official responsible for establishing policy regarding revocations of appointments, and took action that allegedly violated the First

Amendment. Thus, because her decision was not subject to any kind of review, it constitutes the policy of Macomb County. Accordingly, Macomb may not escape liability on this basis.

### 2. Spranger's Motion

Spranger raises three arguments: (i) she was not a state actor, (ii) Plaintiffs cannot establish that an adverse action was taken against them, and (iii) Plaintiffs cannot show that the ethics complaints were a motivating factor in the respective terminations.

### a. State Actor

Spranger first argues that Plaintiffs cannot establish that she was acting under color of state law because, since her alleged offending conduct, she has been removed from office by the Macomb Circuit Court via a writ of quo warranto. The writ invalidated her election victory and removed her from office on the basis that that she did not reside at the address stated on her Affidavit of Identity.

This issue is meritless. Spranger cites no case that says a writ of quo warranto invalidates all action that the official took while in office, and it cannot be the case that an earlier act of wrongdoing can negate responsibility for later acts of wrongdoing. Spranger has presented no caselaw to support her claim. Accordingly, the Court finds that Spranger is liable for actions she took while Macomb County Clerk.

### b. Discourage Individuals of Ordinary Firmness

Spranger next argues that Plaintiffs cannot establish that an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct. Spranger argues that Stahl filed her ethics complaints two days after her termination letter was written, so the two cannot be related. As for Kardasz, Spranger argues that the

termination was "ostensibly contemporaneous" with his firing, and thus the termination could not deter him from filing the ethics complaint.

Despite Spranger's argument, the test for this element is whether the adverse action "would chill or silence a person of ordinary firmness from future First Amendment activities." Thaddeus-X, 175 F.3d at 397. The question is not whether Plaintiff was deterred from engaging in the protected activity as a result of the adverse action. Rather, the question is whether a future person would be deterred from engaging in the same protected activity as a result of the adverse action. Termination certainly qualifies.

As for the argument that Stahl did not file the ethics complaint until after the termination letter was already written, Stahl has presented evidence that she told Spranger on February 20 that she and Kardasz were "going to have to make a complaint if she doesn't change anything." As the Supreme Court has held, "[n]either the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-416 (1979); accord Perry v. McGinnis, 209 F.3d 597, 608 (6th Cir. 2000) (citing Givhan for the proposition that "an employee's choice to communicate privately with an employer does not strip the concern of its public nature."). Evidence has been presented that Spranger was aware that Stahl was contemplating filing an ethics complaint before Stahl's firing; her termination would chill a future employee from taking such action.

### c. Motivating Factor

Finally, Spranger argues that the only evidence presented by either Plaintiff is the temporal relationship of the conduct at issue and the termination, and thus they cannot show that the ethics complaints were a motivating factor for their respective terminations. However, the Sixth Circuit

"has held that the causal connection between the protected activity and the adverse employment action necessary for a prima facie case of retaliation can be established solely on the basis of close temporal proximity." Frazier v. Richland Public Health, 685 F. App'x 443 (6th Cir. 2017). In Frazier, the gap was six weeks. The less-than-three-week gap for Stahl and the same-day gap for Kardasz satisfy this element.

For these reasons, the Court denies this aspect of Spranger's motion for summary judgment.

## B. Whistleblowers' Protection Act

Michigan's Whistleblowers' Protection Act ("WPA") provides that:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362.

A plaintiff must satisfy three elements to establish a prima facie case under the WPA: "(1) he or she was engaged in protected activity as defined by the act, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action." Whitman v. City of Burton, 831 N.W.2d 223, 229 (Mich. 2013). If a prima facie case is established, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for terminating the plaintiff. Reeser v. Henry Ford Health Sys., 119 F. Supp. 3d 710, 719 (E.D. Mich. 2015). The burden then shifts back to the plaintiff, who can establish pretext by showing that their "protected activity was a 'motivating factor' for the adverse

employment decision." Id. at 721 (citing Debano-Griffin v. Lake Cnty., 828 N.W.2d 634, 639 (Mich. 2013)).

### 1. Macomb's Motion

Macomb presents five arguments: (i) Macomb was not Plaintiffs' employer; (ii) Plaintiffs were not engaged in protected activity; (iii) Macomb took no adverse action against Plaintiffs; (iv) there is no evidence of a causal connection; and (v) Plaintiffs cannot rebut the legitimate, non-retaliatory reason for termination.

#### a. Employer Status

Macomb first argues that the requisite employment relationship under the WPA did not exist in this case. Macomb contends that the Michigan Court of Appeals has determined that the necessary employment relationship under the WPA is one of economic reality. See Chilingirian v. City of Frasier, 486 N.W.2d 347 (Mich. Ct. App. 1992). Plaintiffs respond that the Michigan Employment Relations Commission has often found that the county is a co-employer of appointed county officials. See, e.g., Branch Cnty. Bd. of Comm'rs v. Int'l Union, et al, 677 N.W.2d 333 (Mich. Ct. App. 2003).

Macomb cites only general principles in support of its contention that it is not Plaintiffs' co-employer. In Chilingirian, cited by Macomb, the Michigan Court of Appeals articulated that the economic reality test should be utilized to determine whether a certain entity is an employer under the WPA. "Relevant factors to consider under the test include: (1) control of a worker's duties; (2) payment of wages; (3) right to hire, fire, and discipline; and (4) performance of the duties as an integral part of the employer's business toward the accomplishment of a common goal." Chilingirian, 486 N.W.2d at 349. Despite the court in Chilingirian acknowledging that "[a]ll the factors are viewed as a whole and no single factor is controlling," id., Macomb argues

only that it is not a co-employer because it had no ability to appoint or revoke Plaintiffs' appointments.

Even though Macomb's lack of ability to appoint or revoke Plaintiffs' appointments weighs in its favor, other factors do not. For example, Macomb County paid Plaintiffs' wages, see Paystubs, Ex. 28 to Pl. Resp. to Macomb Mot. (Dkt. 56-29), and it cannot be contested that the duties of the Chief Deputy Clerk and the Deputy Register of Deeds play an integral part in accomplishing the goals of the County. Additionally, it seems to be an unstated assumption in the caselaw cited by Plaintiffs that the county is a co-employer of deputies under the statutory scheme at issue here, see, e.g., Branch Cnty. Bd. of Comm'rs, 677 N.W.2d at 336-337 (finding that the county clerk is a coemployer of his or her deputies). Accordingly, the Court finds that the county was a co-employer of Plaintiffs.

### b. Protected Activity

The Michigan Court of Appeals has defined a whistleblower as somebody "who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation." Henry v. City of Detroit, 594 N.W.2d 107 (Mich. Ct. App. 1999).[5] "The

---

[5] The Michigan Supreme Court has never adopted this rule, and it is unclear how the text of the WPA does not apply to reports of "unhidden" violations; the Court of Appeals decision does not explain the origin of this requirement. Indeed, the statute itself includes an exception to the general rule that a person may not be discriminated against for reporting an actual or suspected violation of law to a public body – "unless the employee knows that the report is false," Mich. Comp. Laws § 15.362 – and so tools of statutory interpretation would counsel against a finding that the violation be "as yet hidden." See TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (internal quotation marks omitted). While this Court need not necessarily follow the Michigan Court of Appeals' decisions, see White v. FCA US, LLC, 350 F. Supp. 3d 640, 643 (E.D. Mich. 2018) ("[A]lthough decisions by the state's intermediate appellate courts are not a binding source of authority, they are authoritative absent a strong showing that the [state's supreme court] would decide the issue differently.")

suspected violation of the law is judged on a subjectively reasonable standard: the employee must have been acting in good faith and been subjectively reasonable in the belief that the conduct was a violation of the law." Smith v. Gentiva Health Servs. (USA) Inc., 296 F. Supp. 2d 758, 762 (E.D. Mich. 2003). Macomb argues that Plaintiffs did not reveal any previously undiscovered information in their ethics complaints, and thus their activity was not protected. Macomb also argues that Plaintiffs did not have a reasonable belief that the conduct complained of violated the law.[6] Plaintiffs respond that they had no reason to believe the Ethics Board itself was aware of the conduct alleged in their complaints, and that Plaintiffs believed that the conduct violated laws and ordinances. Plaintiffs have the better of this argument.

While the depositions make it abundantly clear that Spranger's alleged abuses were known throughout her office and by union representatives working on behalf of her employees, Spranger has not successfully shown that the Macomb County Ethics Board, itself an independent public body, see Mich. Comp. Laws 15.361(d)(iii), was aware of the allegations. As for Macomb's contention that "none of [Stahl's] allegations constitute a violation of law, regulation, or rule," see Macomb Mot. at 25, the very first allegation in Stahl's ethics complaint claims that Spranger has failed in her obligation to "comply with all laws and policies of County government." See Stahl Ethics Compl. at PageID.2954. A reasonable jury could certainly find from this allegation that

_____

(internal quotation marks and citations omitted), the outcome would not be different regardless of whether this Court chooses to adopt or disregard the Court of Appeals rule.

[6] Macomb also contends that an "employee who reiterates allegations of which the public body is already aware or who waits to disclose information to advance his own interests, is not engaged in 'protected activity,'" citing Whitman, 831 N.W.2d 223, and Shallal v. Catholic Social Servs. of Wayne Cnty., 566 N.W.2d 571, 579 (Mich. 1997). The former is found nowhere in the cited caselaw, while the latter is explicitly disavowed as dicta in Whitman. See Whitman, 831 N.W.2d at 234 ("To the extent that Shallal has been interpreted to mandate a specific motive, any language to that effect is disavowed as dicta unrelated to the essential holding of the case regarding the causal connection between the protected activity and the adverse employment decision.").

Stahl reasonably believed that the conduct was a violation of law. See Smith, 296 F. Supp. 2d at 762.

### c. Adverse Action

Macomb argues that it did not act to revoke Plaintiff's appointments or discriminate against them in any way. As detailed above, Macomb was a co-employer of Plaintiffs, and thus can be held responsible for their termination.

### d. Causal Connection

As opposed to § 1983 claims, "a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action" in WPA cases. West v. General Motors Corp., 665 N.W.2d 468, 472-473 (Mich. 2003). "Michigan courts have found, however, that temporal proximity, coupled with some other indication of termination on the basis of a protected activity, can satisfy the causation element." Kuhn v. Washtenaw Cnty., 709 F.3d 612, 629-630 (6th Cir. 2013). Macomb argues that Plaintiffs have no evidence beyond timing, and that Plaintiffs were also aware that Spranger intended to terminate them even before they filed their ethics complaints.

There is a genuine issue of material fact as it relates to the causal connection. As for Kardasz, in addition to being fired on the same day that he filed his ethics complaint, he was told directly by Spranger that he was fired because "she was upset about yesterday." Kardasz Dep. at 351. Kardasz filed his ethics complaint the day before that comment was made. Based on this, a jury could certainly find that Kardasz was fired because he filed the ethics complaint.

Similarly, Stahl alerted Spranger on February 20 that she and Kardasz were "going to have to make a complaint if she doesn't change anything." Stahl Dep. at 397. The next day, she was threatened with termination for having a bad attitude. She was terminated less than three weeks

later, the day after Kardasz submitted his ethics complaint. A reasonable jury could conclude that Stahl was fired because it was assumed she was soon to make an ethics complaint. See Mich. Comp. Laws § 15.362 (prohibiting retaliation against a person who "is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule . . .")

For these reasons, the Court finds that Plaintiffs have established a prima facie case that they were fired in violation of the Whistleblowers' Protection Act.

### e. Pretext

The burden next shifts to Macomb to show a legitimate, non-discriminatory reason for terminating Plaintiffs. Macomb has done so, showing that Plaintiffs were not philosophically aligned with Spranger and that they could not function together. The burden then shifts back to Plaintiffs, who can establish pretext by showing that their "protected activity was a 'motivating factor' for the adverse employment decision." Reeser v. Henry Ford Health Sys., 119 F. Supp. 3d 710, 721 (E.D. Mich. 2015) (citing Debano-Griffin v. Lake Cnty., 828 N.W.2d 634, 639 (Mich. 2013)). There is clearly a fact issue here. As laid out above, both Plaintiffs testified that Spranger made comments to them that would indicate she was going to take disciplinary action against them due to their ethics complaints. See id. at 722-723 (finding pretext for the same reasons that established causation when analyzing the prima facie case).

Because a reasonable jury could conclude that Plaintiffs' protected activity was a motivating factor for their terminations, the Court denies Macomb's motion regarding the WPA.

### 2. Spranger's Motion

Spranger, like Macomb, argues that neither Plaintiff has shown a causal connection between the protected activity and the termination. Spranger's arguments are equally unavailing.

As for Stahl, Spranger argues that the evidence shows that Stahl filed the ethics complaint after she was terminated and that she engaged in unprofessional behavior towards Spranger. As detailed above, supra Section III.B.1.d, however:

> Stahl alerted Spranger on February 20 that she and Kardasz were "going to have to make a complaint if she doesn't change anything." Stahl Dep. at 397. The next day, she was threatened with termination for having a bad attitude. She was terminated less than three weeks later, the day after Kardasz submitted his ethics complaint. A reasonably jury could conclude that Stahl was fired because it was assumed she was soon to make an ethics complaint.

Again, there is clearly a fact issue, and Stahl's alleged unprofessional behavior towards Spranger is for a jury to consider.

As for Kardasz, Spranger points to her own testimony that there was a breakdown in communication and that Kardasz was not completing tasks. See Spranger Mot. at 23. Spranger also points to caselaw detailing that more than a temporal proximity is required to show causation in WPA cases. However, as detailed above, in addition to being fired on the same day that he filed his ethics complaint, Kardasz was told directly by Spranger that he was fired because "she was upset about yesterday." Kardasz Dep. at 351. From this, a reasonable jury could find that Kardasz was fired in retaliation for filing the ethics complaint.

These are the only issues raised by Spranger as it related to the WPA claim, and thus her motion is denied.

## IV. CONCLUSION

For these reasons, Macomb's motion for summary judgment (Dkt. 44) and Spranger's motion for summary judgment (Dkt. 47) are denied.

SO ORDERED.

Dated: May 6, 2019                    s/Mark A. Goldsmith
    Detroit, Michigan                    MARK A. GOLDSMITH
                                         United States District Judge